UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X

UNITED STATES OF AMERICA                    **MEMORANDUM AND ORDER**

            - against -                      13-cr-315 (KAM)

CLYDE FALTINE et al.,
            Defendants.

-----------------------------------X
**MATSUMOTO, United States District Judge:**

        A four-count indictment (the "Indictment"), filed on

May 24, 2013, charges defendants Clyde Faltine ("Faltine"),

Rashad Glynn ("Glynn"), Justin Jaikaran ("Jaikaran"), and Corey

Lee ("Lee") with one count of conspiracy to distribute cocaine,

cocaine base, and marijuana in violation of 21 U.S.C.

§§ 841(a)(1), 841(b)(1), and 846, and 18 U.S.C. § 3551 *et seq*.

It also charges all defendants with one count of possession of

cocaine with intent to distribute in violation of, *inter alia*,

21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(ii)(II); one count of

possession of cocaine base with intent to distribute in

violation of, *inter alia*, 21 U.S.C. §§ 841(a)(1) and

841(b)(1)(B)(iii); and one count of possession of marijuana with

intent to distribute in violation of, *inter alia*, 21 U.S.C. §§

841(a)(1) and 841(b)(1)(D).  (ECF No. 30, Indictment filed

5/24/13 ("Ind't") ¶¶ 1-4.)  The Indictment also contains a

criminal forfeiture allegation pursuant to 21 U.S.C. §§ 853(a)

and (p).  (Ind't ¶¶ 5-6.)

Presently before the court are the following pre-trial motions filed by Lee, Faltine, and Jaikaran (collectively, "movants").[1]

**Lee** moves for (a) suppression of post-arrest statements and physical evidence seized from Lee's residence, (b) dismissal of the indictment, (c) disclosure of grand jury empanelment instructions, (d) a bill of particulars, (e) disclosure of the government's confidential informants and permission to interview the informants, (f) suppression of evidence seized pursuant to a court-authorized wire interception, (g) severance, and (h) permission to join in the motions of his co-defendants. (*See generally* ECF No. 72, Lee Am. Omnibus Mot. filed 11/18/13 ("Lee Omnibus Mot.").)

**Faltine** moves to (a) suppress post-arrest statements based on a lack of *Miranda* warning, (b) suppress evidence seized from his restaurant, (c) join in his co-defendants' motions, and (d) reserve his rights to move for severance of his trial. (*See generally* ECF No. 70, Faltine Mot. to Suppress filed 11/18/13 ("Faltine Mot.").)

**Jaikaran** moves to (a) join in the motions made on behalf of his co-defendants and (b) reserve his rights to move

---

[1] On January 31, 2014, the court severed defendant Glynn's case, including his pre-trial motions, and placed it in suspense until December 31, 2014. (ECF No. 83, Order dated 1/31/14.) Thus, Glynn's motions will not be addressed in this Memorandum and Order.

for severance of his trial.  (ECF No. 71, Jaikaran Mot. filed
11/18/13 ("Jaikaran Mot.").)

The government does not oppose Lee's and Faltine's
motions to suppress post-arrest statements based on lack of
*Miranda* warnings and indicates that it will not seek to admit
those statements, except to impeach Lee or Faltine in the event
either defendant testifies, to refresh witnesses' recollection,
or at sentencing.  (ECF No. 76, Gov't Opposition dated 12/19/13
("Gov't Opp."), at 34; ECF No. 92, Gov't Post-Hearing Opposition
to Motions to Suppress dated 4/21/14 ("Gov't Post-Hr'g Opp."),
at 1; ECF No. 86, Gov't Letter Regarding Suppression Hearing
filed 4/3/14 ("4/3/14 Gov't Ltr.").)  The government opposes all
movants' remaining motions.  (*See generally* Gov't Opp.)  The
court has carefully reviewed the parties' submissions, and for
the reasons set forth below, the movants' remaining motions are
granted in part and denied in part.

## BACKGROUND

### I.  Charges

The allegations in the Indictment, the Complaint, and
the government's submissions are as follows:

Between January 2009 and April 2013, defendants
allegedly conspired to distribute and possess with intent to
distribute five kilograms or more of a substance containing
cocaine, 28 grams or more of a substance containing cocaine

base, and marijuana. (Ind't ¶ 1.) Defendants are also charged
with possession of cocaine, cocaine base, and marijuana with the
intent to distribute. (Ind't ¶¶ 2-4.)

The instant charges relate to defendants' alleged
involvement in drug trafficking activity led by Fletcher Voisin,
who is not charged in this Indictment. (ECF No. 1, Criminal
Complaint filed 4/24/13 ("Compl.") ¶¶ 3-9.) In late 2011, the
Drug Enforcement Administration ("DEA") began investigating a
drug-trafficking organization based in Brooklyn, New York, that
was led by Voisin. (Compl. ¶ 3.) In June 2012, agents
installed a pole camera outside of a warehouse located at 305
East 89th Street in Brooklyn that was used by the organization.
(*Id.*) On July 5, 2012, the Honorable Margo K. Brodie authorized
the government to intercept Voisin's telephone communications.
(*Id.*) From July 9, 2012, to August 7, 2012, agents intercepted
telephone calls between Voisin and defendants Lee, Faltine, and
Glynn, that allegedly related to narcotics trafficking. (*See*
Compl. ¶ 9.) Agents also intercepted calls referring to
defendant Jaikaran allegedly regarding narcotics. (Compl. ¶¶
17-18.)

On August 1, 2012, agents executed a search warrant,
issued by the Honorable Joan M. Azrack, on the warehouse.
(Compl. ¶ 4.) During the course of their search, agents found
seven kilograms of cocaine, approximately 169.7 grams of cocaine

base, approximately 150 pounds of marijuana, three loaded firearms, scales, narcotics wrapping material, a bullet-proof vest, approximately $400,000 in United States currency, a fake identification card, and a ledger that appeared to be a drug ledger. (Compl. ¶¶ 6-7.)

On April 24, 2013, pursuant to the Complaint, the Honorable Ramon E. Reyes signed arrest warrants for Lee, Faltine, Jaikaran, and Glynn. (ECF Nos. 2-5, Arrest Warrants dated 4/24/13.) Judge Reyes also signed a search warrant for Faltine's place of business, "Mr. Taste," a restaurant located at 5222 Church Avenue, Brooklyn, New York. (Gov't Opp., Ex. C, Search Warrant for 5222 Church Ave., dated 4/24/13 ("5222 Church Ave. Search Warrant").) DEA agents executed the arrest and search warrants for all defendants on April 25, 2013.

DEA agents arrested Lee at his apartment, located at 65101 Terrace Court, Apartment 2, Middle Village, New York. The agents encountered Lee's partner, Toya Cephus,[2] when they first arrived at the apartment. Agents then entered the apartment and proceeded to the rear bedroom, where they arrested Lee. (Govt' Opp. Br. at 3.) Agents did not provide Lee with a *Miranda* warning. (*Id.*) After arresting Lee, agents seized United

---

[2] Ms. Cephus, while under oath, referred to herself as Lee's wife and as his girlfriend. (*See* Lee Omnibus Mot., Cephus Aff. at 7 ("I am the girlfriend of Defendant Corey Lee"); ECF No. 93, Lee Suppression Hearing Tr. ("Tr.") dated 3/17/14, at 57 (referring to "my husband, Corey Lee").) The court will refer to Ms. Cephus as Lee's partner.

States currency from a safe in the bedroom closet, cell phones, bags of marijuana from the garage, and drug contraband from the kitchen. (*Id.*) The parties dispute whether Lee gave permission to search his apartment.

Agents arrested Faltine at Faltine's restaurant, Mr. Taste, located at 522 Church Avenue in Brooklyn, New York. While executing the search warrant, agents found powder cocaine, cocaine base, marijuana, bundles of United States currency, and scales with cocaine residue. (Gov't Opp. at 4.)

Jaikaran was arrested at his residence. (*Id.* at 3-4.) All three movants were arraigned on a criminal complaint before Judge Reyes on April 25, 2013.[3] (ECF No. 7, Minute Entry dated 4/25/13.) On May 24, 2013, a grand jury returned the Indictment charging defendants with the aforementioned counts. (Ind't.) On June 3, 2013, defendants Lee and Faltine were arraigned on the Indictment and entered pleas of not guilty. (ECF No. 36, Minute Entry dated 6/3/13.) On June 4, 2013, Jaikaran was arraigned on the Indictment and pleaded not guilty to all counts. (ECF No. 40, Minute Entry dated 6/4/13.)

## DISCUSSION

---

[3] Glynn, whose case has been severed, was arrested on August 25, 2013, at his apartment residence and arraigned that same day. (Gov't Opp. at 4; ECF No. 16, Minute Entry dated 4/25/13.)

## I. Motion to Join in Co-Defendants' Motions and to Reserve Motions to Sever

Lee, Faltine, and Jaikaran have moved to join in the motions of their co-defendants. (Lee Omnibus Mot. at 72; Jaikaran Mot. at 1; Faltine Mot. at 1.) The court grants their motions. To the extent that any defendant has requested to reserve his rights to move at a later date, these requests are denied. The court set a briefing schedule for motions, and the parties were expected to adhere to it. (*See* Minute Entry dated 10/16/13.) Accordingly, the requests by Jaikaran and Faltine to reserve their rights to move for severance at a later date are denied, and the court shall construe their requests as a motion for severance.

## II. Motions for Severance

### A. Alleged Grounds for Severance

Each movant moves to sever his trial from that of the other defendants, based on conclusory assertions that a joint trial will result in prejudicial spillover and that the defendants have mutually antagonistic defenses. (*See* Lee Omnibus Mot. at 32-33; Jaikaran Mot. at 1-2; Faltine Mot. at 3.) Defendants do not explain how their defenses may be mutually antagonistic. Only Lee has articulated a specific ground for severance based on spillover prejudice, arguing that evidence pertaining to his co-defendants that involve cocaine and cocaine

base distribution conspiracies may prejudice him in light of the "scant evidence against him overall" and the "lack of nexus attributable between Mr. Lee and the Cocaine and Crack conspiracies." (Lee Omnibus Mot. at 32-33.)

**B.  Legal Standard**

Under Federal Rule of Criminal Procedure 8(b), multiple defendants who allegedly "participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses" may be charged in a single indictment. Fed. R. Crim. P. 8(b).  Federal Rule of Criminal Procedure 14(a) allows a court to "order separate trials of counts, sever the defendants' trials, or provide any other relief that justice so requires" if "the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant or the government."  Fed. R. Crim. P. 14(a).

The Supreme Court has expressed a strong "preference in the federal system for joint trials of defendants who are indicted together" to promote judicial efficiency and prevent the inequity of inconsistent verdicts.  *Zafiro v. United States*, 506 U.S. 534, 537 (1993).  Indeed, "a district court should grant severance under Rule 14 *only* if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilty or innocence."  *Id.* at 539

8

(emphasis added); *United States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008).

A defendant who claims there is a risk of prejudicial spillover from a joint trial "bears an extremely heavy burden." *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1998) (internal quotation marks and citation omitted). The defendant must show that "prejudice would be so great as to deprive him of his right to a fair trial." *United States v. Bellomo*, 954 F. Supp. 630, 649 (S.D.N.Y. 1997) (citing *United States v. Casamento*, 887 F.2d 1141, 1149 (2d Cir. 1989)). The risk of prejudice against a defendant from a joint trial may be heightened where, for example, "many defendants are tried together in a complex case and they have markedly different degrees of culpability." *Zafiro*, 506 U.S. at 539. Prejudice warranting severance may also be present if "essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial." *Id.* Whether sufficient prejudice exists is a highly fact-specific determination. *Id.* In many situations where the risk of prejudice is high, "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice" from a joint trial. *Id.* Moreover, the decision of whether to sever a trial is committed to the sound discretion of the

district court." *Id.* at 541; *United States v. Wilson*, 11 F.3d 346, 353-54 (2d Cir. 1993).

**C.  Application**

Here, the court finds that defendants have failed to meet their heavy burden of establishing that severance is warranted.

First, regarding the risk of prejudicial spillover, Faltine and Jaikaran merely make conclusory assertions of prejudice and do not provide any details whatsoever as to how a joint trial could prejudice them.  Lee argues that there is a risk of prejudicial spillover due to the evidence against his co-defendants involving cocaine and cocaine base, the lack of evidence relating to his involvement in any alleged cocaine and cocaine base conspiracies, and the "scant evidence against him overall."  (Lee Omnibus Mot. at 33.)

It is well-established that differing levels of culpability and involvement among defendants and disparities in the quantity of evidence "are inevitable in any multidefendant trial, and by themselves do not warrant severance." *United States v. Cardascia*, 951 F.2d 474, 483 (2d Cir. 1991) (rejecting a "guilt by association" argument for severance); *United States v. Nersesian*, 824 F.2d 1294, 1304 (2d Cir. 1987) (affirming denial of severance where defendants claimed there was only minimal evidence against them compared to evidence against co-

defendants). The Second Circuit has held that "joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible." *United States v. Locascio*, 6 F.3d 924, 947 (2d Cir. 1993). Moreover, spillover prejudice may be cured by providing careful limiting instructions about the evidence to be considered against each defendant. *Id*. Therefore, the movants' claims of spillover prejudice are not persuasive, and do not warrant severance.

Furthermore, the movants' claims that their defenses are mutually antagonistic do not require severance. "A simple showing of some antagonism between defendants' theories of defense do not require severance." *United States v. Carpentier*, 689 F.2d 21, 27-28 (2d Cir. 1982); *Zafiro*, 506 U.S. at 438. Antagonistic defenses rise to the level of prejudice requiring severance only "upon a showing that the jury, in order to believe the core of testimony offered on behalf of one defendant, must necessarily disbelieve the testimony offered on behalf of his codefendant." *Grant v. Hoke*, 921 F.2d 28, 31 (2d Cir. 1990) (internal quotation marks and citation omitted). Here, the movants have failed to articulate any details regarding mutually antagonistic defenses, much less show that the core of one of their defenses conflicts with the defense of a codefendant. Absent any specific showing as to how one

defense could conflict with a co-defendant's defense, severance is not warranted.

For these reasons, the motions by Lee, Faltine, and Jaikaran to sever their trials are denied.

## III. Motion to Disclose Grand Jury Empanelment Instructions and Dismiss the Indictment

Lee, joined by Jaikaran and Faltine, moves to dismiss the Indictment and to disclose the grand jury empanelment instructions. (Lee Omnibus Mot. at 12-17.) Specifically, Lee argues, based "on information and belief," that the grand jury was erroneously instructed that it was obligated to indict upon a finding of probable cause and that it could not consider the wisdom of laws enacted by Congress nor possible punishments. Lee moves the court to disclose the grand jury empanelment instructions and to dismiss the Indictment based on these alleged errors in jury instructions, as well as on a lack of probable cause. (Lee Omnibus Mot. at 12.)

### A. Legal Standard

Disclosure of grand jury proceedings is permitted "upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." Fed. R. Crim. P. 6(e)(3)(C)(ii). There is a baseline presumption against disclosure of grand jury proceedings, and the trial court has broad discretion to decide whether

disclosure is appropriate.  *In re Petition of Craig*, 131 F.3d

99, 104 (2d Cir. 1997).  The defendant bears the burden of

demonstrating a "particularized need" for disclosure of grand

jury materials "that outweighs the government's interest in

maintaining the continued secrecy of the grand jury proceeding."

*Anilao v. Spota*, 918 F. Supp. 2d 157, 173-74 (E.D.N.Y. 2013);

*United States v. Nunez*, No. 00 CR 121, 2001 WL 91708, at *11

(S.D.N.Y. Feb. 1, 2001) (citing *United States v. Sells Eng'g*,

463 U.S. 418, 443 (1983)).

     "[U]nspecific allegations of need or mere speculation

are not adequate."  *Anilao*, 918 F. Supp. 2d at 174; *United*

*States v. Torres*, 901 F.2d 205, 233 (2d Cir. 1990), *abrogated on*

*other grounds by United States v. Marcus*, 628 F.3d 36 (2d Cir.

2010) ("A review of grand jury minutes is rarely permitted

without specific factual allegations of government

misconduct.").  Moreover, a "defendant is not routinely entitled

to grand jury . . . instructions in order to engage in a fishing

expedition in hopes of uncovering an impropriety or defect in

the proceeding where he has no basis to conclude that an

impropriety or defect exists."  *United States v. Abounnajah*, No.

CR-91-00146, 1991 WL 42895, at *2 (E.D.N.Y. Mar. 26, 1991)

(citing *United States v. Abrams*, 539 F. Supp. 378, 389 (S.D.N.Y.

1982)); *see also United States v. Stern*, No. 03 CR. 81, 2003 WL

22743897, at *3 (S.D.N.Y. Nov. 30, 2003) ("[A]bsent any

indication of government impropriety that would defeat that presumption [of regularity], this court has no roving commission to inspect grand jury minutes, and will not fashion one.").

Furthermore, the standard to dismiss an indictment is a high one. "[D]ismissal of the indictment is appropriate only if it is established that the violation substantially influenced the grand jury's decision to indict, or if there is grave doubt that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 256-57 (1988) (internal quotation marks and citation omitted). Thus, in *Bank of Nova Scotia*, the Supreme Court held that the harmless error standard under Federal Rule of Criminal Procedure 52(a) applies to the dismissal of an indictment.[4] *Id.* at 255-56. The only "isolated exceptions" to the harmless error standard involve "fundamental" or "structural" errors, which "so compromise[]" the grand jury proceedings as to render them "fundamentally unfair, allowing the presumption of prejudice." *Id.* at 256-57 (citing, as examples, racial discrimination in selection of grand jurors). Notably, even if a grand jury was improperly instructed, "that error is not a basis for the defense obtaining the Grand Jury

---

[4] Federal Rule of Criminal Procedure 52(a) states: "Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a).

minutes since (absent a showing of prejudice to defendants due to the error) errors in Grand Jury proceedings alone are not a basis for dismissal of an Indictment." *United States v. Larson*, No. 07 CR 304S, 2012 WL 4112026, at *4 (W.D.N.Y. Sept. 18, 2012) (citing *Bank of Nova Scotia*, 487 U.S. at 254).

### B. Application

Here, Lee argues that the grand jury minutes should be disclosed and the Indictment be dismissed because of alleged errors in the grand jury empanelment instructions. Specifically, Lee, "upon information and belief," contends that the grand jury instructions erroneously (1) misled the grand jurors by instructing them that their sole responsibility was to make a probable cause determination and then return an indictment upon a finding of probable cause, and (2) failed to instruct the grand jury of its history power to refuse to indict. (Lee Omnibus Mot. at 14-16.) Lee argues that these alleged errors in the grand jury instructions unconstitutionally usurped the grand jury's independence. (*Id.*) Lee also contends that the Indictment should be dismissed for lack of probable cause. (*Id.* at 16.)

It is well-established that the movant bears the burden of demonstrating a particularized need for the disclosure of grand jury minutes, and this particularized need must outweigh the government's interest in maintaining the continued

15

secrecy of the grand jury proceeding. *Anilao*, 918 F. Supp. 2d at 173-74; *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222 (1979). Here, Lee has not made any showing of particularized need, nor provided any basis upon which to believe that the grand jury empanelment instructions contained unconstitutional errors. Moreover, Lee's reliance on a footnote from an out-of-circuit opinion, *United States v. Alter*, 482 F.2d 1016 (9th Cir. 1973), does not support disclosure here, where there is more recent, controlling Second Circuit precedent requiring a particularized need for disclosure. *See, e.g.*, *United States v. Moten*, 582 F.2d 654, 662 (2d Cir. 1978); *Torres*, 901 F.2d at 233. Absent any showing of particularized need, the court will not allow Lee to "engage in a fishing expedition in hopes of uncovering an impropriety or defect in the proceeding." *Abounnajah*, 1991 WL 42895, at *2. Accordingly, Lee's motion for disclosure of the grand jury empanelment instructions is denied.

Furthermore, even if disclosure of the grand jury empanelment instructions were warranted, and even if the instructions did in fact contain the alleged errors that Lee posits, there would still be no basis for dismissing the Indictment. Lee raises two alleged errors "on information and belief": (1) instructing the grand jury to indict upon a finding of probable cause, and (2) instructing the grand jury to not

16

consider the wisdom of laws enacted by Congress nor possible punishments. (Lee Omnibus Mot. at 14.) The government points out that Lee appears to base his arguments on the Model Federal Grand Jury Charge. (Gov't Opp. at 5.) Courts have consistently upheld as constitutional the Model Charge, instructions to indict if probable cause is found, and instructions to not consider the wisdom of criminal laws enacted by Congress. *See United States v. Bruno*, No. 09-CR-29, 2009 WL 2601249, at *5 (N.D.N.Y. Aug. 21, 2009) ("Even if the court were to assume that the Model Charge was used, the Model Charge is constitutional"); *United States v. Knight*, 490 F.3d 1268, 1271-72 (11th Cir. 2007) (holding that grand jury instructions based on Model Jury Instructions were constitutional and did not deprive grand jury of its independence); *United States v. Navarro-Vargas*, 408 F.3d 1184, 1205-06 (9th Cir. 2005) (en banc) (holding that grand jury instructions stating, "You cannot judge the wisdom of the criminal laws enacted by Congress" and "you should vote to indict where the evidence presented to you is sufficiently strong to warrant" a finding of probable cause, are both constitutional).

Moreover, even if these alleged errors in the grand jury empanelment instructions were unconstitudional, Lee would still have to show that the errors were prejudicial, and not merely harmless error. *Bank of Nova Scotia*, 487 U.S. at 254-55.

Lee has made no attempt to meet the harmless error standard under Federal Rule of Civil Procedure 52(a).  Instead, Lee claims that the alleged errors were "structural errors."  (Lee Omnibus Mot. at 15.)  This argument is unavailing.  Courts have recognized only a very "limited number of structural errors, all involving the violation of bedrock constitutional rights, such as total deprivation of the right to counsel; exclusion of jurors on the basis of race; and improper closure of a courtroom to the public." *United States v. Moran-Toala*, 726 F.3d 334, 343-44 (2d Cir. 2013) (internal citations omitted).  Significantly, "[t]he category of recognized structural errors with regard to jury instructions is even more limited." *Id.*  Lee does not identify, nor could the court find, any authority supporting the assertion that the two alleged errors in the grand jury empanelment instructions are structural and fundamental.  Accordingly, Lee's motion to dismiss the Indictment based on allegedly erroneous grand jury empanelment instructions is denied.

In a final attempt to dismiss the Indictment, Lee asserts that the Indictment was not supported by sufficient evidence or probable cause.  (Lee Omnibus Mot. at 16-17.)  Lee claims that there is no evidence in any of the discovery relating to his alleged participation in a conspiracy involving

cocaine and/or cocaine base, and he notes that only marijuana was found at his residence. (*Id.* at 16.)

Lee's motion to dismiss the Indictment on these grounds is also denied. It is "well settled that 'an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'" *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)); *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992). A valid indictment "need do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *Stavroulakis*, 952 F.2d at 693 (internal quotation marks and citation omitted). Here, the Indictment against Lee and his co-movants has met this lenient standard. (*See* Ind't.) Moreover, a defendant may not challenge a facially valid indictment prior to trial on the basis of insufficient evidence; the proper way to raise evidentiary insufficiency is through a Rule 29 motion before the case is submitted to the jury, or after a jury verdict. *United States v. Gambino*, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992); *accord United States v. Cafaro*, 480 F. Supp. 511, 520 (S.D.N.Y.

1979).  Accordingly, the motion to dismiss the Indictment based on insufficient evidence is also denied.

## IV.  Motion for a Bill of Particulars

Lee, joined by Jaikaran and Faltine, further moves for a bill of particulars pursuant to Federal Rule of Criminal Procedure 7(f).[5]  (Lee Omnibus Mot. at 34.)  Lee argues that it is necessary to obtain a bill of particulars regarding his involvement in every count of the indictment to "adequately prepare for trial," on the grounds that the Indictment's substantive counts "are nebulous and simply recite statutory language." (*Id.* at 35.)  In particular, Lee seeks, *inter alia*, the exact acts and dates of acts attributable to him; the basis for the government's belief that he possessed with intent to distribute cocaine and/or cocaine base; the date, time, and place that he allegedly joined the conspiracy; and a full accounting regarding the government's allegation in the forfeiture count of the Indictment.  (*Id.* at 35.)

### A.  Legal Standard

The purpose of a bill of particulars is to "'provide sufficient information about an offense to permit the defendant

---

[5] Rule 7(f) states: "The court may direct the government to file a bill of particulars.  The defendant may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits. The government may amend a bill of particulars subject to such conditions as justice requires." Fed. R. Crim. P. 7(f).

to prepare for trial, to avoid unfair surprise, and to preclude a second prosecution for the same offense.'" *United States v. Heil*, No. 06 CR 00749, 2007 WL 4125124, at *3 (E.D.N.Y. Nov. 16, 2007) (quoting *United States v. Mason*, No. 06 Cr. 80, 2007 WL 541653, at *5 (S.D.N.Y. Feb. 16, 2007)). It "'is not a general tool of discovery, nor is it a device to give the defense a road map to the government's case.'" *Id.* A bill of particulars "is required only where the charges of the indictment are so general that do they not advise the defendant of the specific acts of which he is accused," depriving a defendant of the ability to prepare for trial. *United States v. Chen*, 378 F.3d 151, 162 (2d Cir. 2004) (internal quotation marks and citations omitted). A bill of particulars is "not necessary where the government has made sufficient disclosures concerning its evidence and witnesses by other means," such as through the indictment and discovery. *Id.; United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999); *United States v. Barnes*, 158 F.3d 662, 665 (2d Cir. 1998).

A district judge has discretion to deny a bill of particulars "'if the information sought by defendant is provided in the indictment or some other acceptable alternate form.'" *United States v. Lino*, No. 00 CR. 632, 2001 WL 8356, at *3 (S.D.N.Y. Jan. 2, 2001) (quoting *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam)). The "proper

test in deciding whether a bill of particulars should be required of the Government is whether the bill of particulars is *necessary* for the defense, not whether it would aid the defendant in his preparation" for trial. *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (denying motion for bill of particulars where government provided detailed indictment and discovery information).

### B. Application

Here, the motion for a bill of particulars is denied because the court finds that Lee and his co-movants have been adequately advised of the specific acts of which they are accused through the Indictment and the government's discovery disclosures.

The Indictment sets forth the crimes charged, the approximate date range during which the crimes were allegedly committed, the participants, the approximate location, and the substances involved. (*See* Ind't.) In addition, the government has made available to the defense discovery that includes photographs taken during searches; video surveillance of three addresses; pen registers; GPS data; calls recorded pursuant to a wire interception that involved Lee, Faltine, and Glynn; and items seized from four addresses. (*See* ECF No. 46, Gov't Ltr. Attaching Rule 16 Discovery, dated 7/3/13; Minute Entry

Regarding Additional Discovery, dated 9/9/13.)  Furthermore, the government's opposition brief attached affidavits from DEA Special Agent Justin Eckert ("Agent Eckert") and DEA Special Agent Boc ("Agent Boc") in support of warrants for wire interception and location data, as well as Agent Eckert's affidavit in support of a search warrant for Faltine's restaurant.  (Gov't Opp., Exs. A-C.)  All three of these affidavits set forth specific dates, times, locations, names of other actors, and cellular phone conversations that allegedly relate to the defendants and the charged offenses.

Given the extent of the discovery disclosures and the information contained in the Indictment, the court finds that movants have been provided with sufficient information regarding the crimes with which they have been charged.  Accordingly, the motion for a bill of particulars is denied.

**V.    Motion for Disclosure of Confidential Government Informants**

Lee, joined by Jaikaran and Faltine, also makes a premature motion, pursuant to *United States v. Saa*, 859 F.2d 1067 (2d Cir. 1988), to speak with the government's confidential informants in the event that the government decides not to call any of them as witnesses at trial.  (Lee Omnibus Mot. at 36.)

**A.    Legal Standard**

Under *Saa*, a defendant who seeks disclosure of a confidential informant's identity must show that the informant's

potential testimony is "material to the defense." *Saa*, 859 F.2d
at 1073 (citing *United States v. Jimenez*, 789 F.2d 167 (2d Cir.
1986)).  It is not enough to show that the informant was a
participant or a witness to the charged crime, or that the
informant's testimony could cast doubt on the credibility of a
government witness.  *Id.; United States v. Castro*, No. S 94 CR
809, 1995 WL 6235, at *2 (S.D.N.Y. Jan. 6, 1995) (denying
disclosure of identities where defendant only offered
speculation as to how informant could be helpful to defense).

  **B.  Application**

   Lee makes only a blanket request for disclosure of the
identities of the government's confidential informants and the
opportunity to interview them, and has made no attempt to meet
the *Saa* standard requiring a showing of materiality.
Accordingly, the motion is denied.

**VI.  Motions to Suppress Post-Arrest Statements Made by Lee and
  Faltine**

   Lee and Faltine both move to suppress their post-
arrest statements based on a lack of *Miranda* warning.  (ECF No.
91, Lee Supplemental Affirmation in Support of Mots. to Suppress
dated 4/21/14 ("Lee Supp. Br."), at 3; Faltine Mot. at 1.)  The
government does not oppose these motions and agrees to not
introduce Lee's and Faltine's post-arrest statements, made
without a *Miranda* warning, in its case-in-chief. (Gov't Opp. at

34; Gov't Post-Hr'g Opp. at 1; 4/3/14 Gov't Ltr.)  The
government reserves the right to use any non-*Mirandized* post-
arrest statements to impeach defendants' testimony, in the event
Lee or Faltine chooses to testify at trial; to refresh witness's
recollection; or at sentencing.  *United States v. Havens*, 446
U.S. 620, 627-28 (1980) (concluding that illegally obtained
evidence that is inadmissible on government's direct case is
properly admissible for purposes of impeachment); *United States
v. Douglas*, 525 F.3d 225, 248 (2d Cir. 2008) (statements
obtained in violation of *Miranda* can be used to impeach
defendant's testimony); *United States v. Kusek*, 844 F.2d 942,
949 (2d Cir. 1988) (holding that illegally obtained evidence is
admissible to refresh witness's memory); *United States v.
Tejada*, 956 F.2d 1256, 1263 (2d Cir. 1992) (holding that
illegally seized evidence must be considered at sentencing if
relevant).

Accordingly, Lee's and Faltine's unopposed motions to
suppress their post-arrest statements made without a *Miranda*
warning are granted, with the reservation of the government's
options.

**VII. Motion to Suppress Evidence Seized from Lee's Residence**

Lee moves to suppress evidence seized from his
residence, arguing that the search of his residence, located at
65101 Terrace Court in Middle Village, Queens, was warrantless

and nonconsensual.  (Lee Omnibus Mot. at 29.)  The government

contends that Lee consented to the search following his arrest,

and that the items in the kitchen were lawfully seized because

they were in plain view.  (Opp. at 29-32.)

On March 17, 2014, the court held an evidentiary

hearing regarding Lee's suppression motion, during which the

government presented Agent Eckert as a witness.  The defense

called Lee's partner, Toya Cephus, to testify, and Lee testified

on his own behalf.  (*See generally* ECF No. 93, Lee Suppression

Hearing Tr. ("Tr.") dated 3/17/14.)

### A.    Legal Standard

It is well settled that a warrantless search is "per

se unreasonable" under the Fourth Amendment, "subject only to a

few specifically established and well-delineated exceptions."

*Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal

quotation marks and citations omitted).  One of these exceptions

is a search conducted pursuant to the "voluntary consent of a

person authorized to grant such consent."  *United States v.

Elliott*, 50 F.3d 180, 185 (2d Cir. 1995).  A consensual search,

where the consent was not coerced, is not an unreasonable

search.  *Id.*  The government bears the burden of proving, by a

preponderance of evidence, that a consent to search was

voluntary, *United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir.

2004), and "not the result of duress or coercion, express or implied." *Schneckloth*, 412 U.S. at 248.

"Voluntariness is a question of fact determined by a 'totality of the all the circumstances.'" *Isiofia*, 370 F.3d at 231 (quoting *Schneckloth*, 412 U.S. at 227)). Knowledge of the right to refuse consent is not necessary for a finding of voluntariness. *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995). According to the Supreme Court, the "standard for measuring the scope of a suspect's consent [to search] under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). Thus, the "ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *Garcia*, 56 F.3d at 423 (internal quotation marks and citation omitted).

In determining whether, given the totality of the circumstances, the suspect voluntarily gave consent to a search, the court may look at various relevant factors, including "the possible vulnerable mental state of the consenting party, the details of the investigation, and the individual's intelligence and experience." *United States v. Ramirez*, 903 F. Supp. 587, 590 (S.D.N.Y. 1995) (citing *United States v. Medico*, 557 F.2d 309, 312 (2d Cir. 1977)); *see also United States v. Guzman*, 724

F. Supp. 2d 434, 441 (S.D.N.Y. 2010). Consent obtained from a person in custody requires "more careful scrutiny," and other relevant factors in determining voluntariness include "whether guns were drawn or the consenting individual was frisked, or whether the consenting individual was threatened, was in a public area, or was informed that he had the option of refusing consent to the search." *United States v. Puglisi*, 790 F.2d 240, 243-44 (2d Cir. 1986) (internal citations omitted). Consent to a search "can be found from an individual's words, acts, or conduct." *Krause v. Penny*, 837 F.2d 595, 597 (2d Cir. 1988). Notably, the presence of several law enforcement officers does not negate consent. *See Garcia*, 56 F.3d at 423 ("Consent to a search has been found despite formal arrest, and such additional aggravating circumstances as handcuffing of a suspect, the presence of six law enforcement officers in his home, and their assurance that they would remain indefinitely and secure a search warrant if consent were withheld." (internal citations omitted)). Nor does a lack of a knowing and intelligent waiver of the right to refuse consent invalidate consent to a search. *United States v. Valencia*, 645 F.2d 1158, 1165 (2d Cir. 1980).

## B. Factual Findings

As summarized below, during the evidentiary hearing, Lee and Ms. Cephus presented a sworn account of Lee's arrest and

the search of the residence that flatly contradicted Agent
Eckert's account.

### 1. Agent Eckert's Testimony

According to Agent Eckert, on the morning of April 25,
2013, he and a team of approximately ten DEA agents and police
officers went to Lee's residence to execute an arrest warrant
for Lee. (Tr. at 6, 24.)  They first observed Lee's two
children and his partner, Toya Cephus, exit the apartment
residence, and greeted Ms. Cephus. (Tr. at 6.)  Agents told Ms.
Cephus that they had an arrest warrant for Lee and asked if he
was inside the residence, and Ms. Cephus replied in the
affirmative. (*Id.*)  The agents then told Ms. Cephus she could
go on her way, and she left the home with the children. (*Id.*)

Agent Eckert and two other agents then entered the
apartment, while the rest of the team remained outside. (Tr. at
7, 24-25.)  Agent Eckert testified that the entry team went
directly down the hallway to the back bedroom, the door of which
was open, and saw Lee sitting on the bed in boxer shorts. (Tr.
at 7.)

The agents asked Lee to show them his hands, and he
complied. (Tr. at 30-31.)  Agent Eckert further testified that
though the three agents initially had their weapons drawn as
part of safety protocol when executing arrest warrants, they put
their guns away "immediately" once they observed Lee sitting,

unarmed, on the bed. (*Id.*) Agent Eckert told Lee that the agents had an arrest warrant, and then asked "if there were any guns, any weapons, anything that could hurt us inside of the residence, any drugs, any money, anything that he shouldn't have." (Tr. at 8, 31-33, 37-38.) According to Agent Eckert, Lee replied that he had money and "just marijuana." (*Id.* at 8.) Agent Eckert acknowledged that agents did not give Lee any *Miranda* warning at any time in the apartment, and that Lee was only read the *Miranda* warning several hours later when he was taken to the DEA field office for processing. (Tr. at 8, 35-37.)

The agents then asked Lee if they had permission to search his residence, and according to Agent Eckert, "Lee said that he would cooperate and that we could" search. (Tr. at 8, 38.) Agent Eckert testified that Lee cooperated in the search by showing agents where cash and cellular phones were located inside his bedroom. (Tr. at 39, 41.) Specifically, Lee told agents that he had money inside of a safe in his closet, and opened the safe with a code and a key. (Tr. at 9-10, 38-39.) In the safe, agents found currency.[6] (Tr. at 10; Gov't Ex. 4.) According to Agent Eckert, Lee also stated that there was more money inside his night stand drawer, and moved to the night

---

[6] Lee testified that the safe contained approximately $3000 in various bills. (Tr. at 74-75.)

stand to open the drawer. (Tr. at 10, 41.) Agents seized money

from the night stand drawer as well as multiple cell phones

located on the night stand. (Tr. at 10.) Agent Eckert

testified that the night stand drawer was slightly open before

Lee went to it, so that someone standing over the night stand

could see "some cash as well as phones." (Tr. at 39.)

Agent Eckert testified that they then took Lee to the

kitchen area of the apartment, next to the front door of the

apartment, where the other team members who had since entered

the apartment were standing. (Tr. at 42.) The other agents

notified Agent Eckert that they had found items they believed to

be drug paraphernalia in plain view. (Tr. at 11-12, 25-26;

Gov't Ex. 6.) According to Agent Eckert, the items were located

in an open plastic bag sitting on the kitchen counter. (Tr. at

12, 17.) Agent Eckert testified that the bag was open and non-

transparent, and that one could see inside the bag from a

vantage point by the front door, and by walking up to the bag

and looking inside through the open top.[7] (Tr. at 12, 17.)

Inside the bag were a sifter, a gas mask, a grinder, three

scales, and a bottle containing what appeared to be cutting

_____

[7] While Agent Eckert testified that the items seized from the kitchen were
inside an open plastic bag (Tr. at 12-17), on cross-examination, he clarified
that the items were inside a black plastic bag as well as a canvas bag. (Tr.
at 44-45.) He testified that both bags were on top of the kitchen counter
when the agents standing in the kitchen area brought them to his attention.
(Tr. at 46.)

agent powder.  (Tr. at 18; Gov't Ex. 6.)  Agents seized these
items as well.

Lee also stated that he had marijuana and would show
the agents where it was kept.  (Tr. at 12.)  According to Agent
Eckert, Lee led other agents to the garage, located through a
separate hallway and stairwell, and identified the key to open
the garage.  (Tr. at 13, 47-48.)  Lee then showed agents where
the marijuana was by opening closed, black garbage bags in front
of his Porsche vehicle.  (Tr. at 19, 49.)  Agents seized pound
quantities of marijuana from the garage.  (Tr. at 13.)

Agents then took Lee to the DEA New York Field
Division for processing.  (Tr. at 13.)  Lee was asked to sign a
written waiver and consent form to the search of his residence,
and he declined.[8]  (Tr. at 13, 52-53.)

### 2.  Lee's and Ms. Cephus's Testimony

During the hearing, Lee and Ms. Cephus presented an
account of the arrest and search that contradicted Agent
Eckert's testimony.  The material differences will be reviewed
herein.

First, Ms. Cephus testified that when she left the
apartment and walked down the building's interior front stairs

---

[8] Agent Eckert testified that DEA agents "sometimes" present a consent and
waiver form while on the premises of the search (Tr. at 52), but that none of
the agents had a form on their person while executing the arrest warrant and
conducting the search that day.  (Tr. at 36.)

to the main front door, she saw two agents proceeding downstairs into the building's basement. (Tr. at 59.) Ms. Cephus testified that she went back upstairs to her apartment to tell Lee that law enforcement officers were in the building. (Tr. at 60-62.) Ms. Cephus then took the children and left the apartment, and was not present when agents entered the apartment, arrested Lee, and searched the apartment. (Tr. at 61-62, 65.) Ms. Cephus testified that she saw three other agents as she left, and that none of them notified her that her husband was under arrest. (Tr. at 61.)

Lee testified that he was in the bedroom when law enforcement agents entered, but that they never asked if they could search the apartment and began looking around the bedroom "as soon as they came in." (Tr. at 71, 73.) Lee denied giving permission to law enforcement agents to search his home. (Tr. at 70.) Lee further testified that the agents asked him if he had drugs in the house, but never asked anything about guns or money. (Tr. at 73.) According to Lee, agents found the safe on their own as they searched the bedroom and were able to open the safe on their own because it was unlocked.[9] (Tr. at 74.) Lee also testified that agents searched the nightstand drawers

---

[9] Lee testified that the safe required a combination and a key to unlock and open it, but that on the day of the search, the door of the safe was shut but unlocked. (Tr. at 75-76.)

without permission and found the cellular telephones, and asked him to give them the key to his car.  (Tr. at 76.)

When Lee was brought outside the bedroom, he saw more agents "going all through the house like searching the apartment."  (Tr. at 71.)  In addition, Lee denied owning most of the objects found in the kitchen.  Specifically, Lee testified that the gas mask was his, but denied that it was in the kitchen on the day of the search.  (Tr. at 77.)  Lee stated that the grinder was a coffee grinder that belonged to his wife, and was "probably . . . in the kitchen closet" on the day of the search.  (Tr. at 78.)  As for the bottle of powder, Lee testified that the bottle belonged to him and contained "Ampersol," a substance for weight gain.  (Tr. at 78.)  Lee denied owning the three scales and averred that he had never seen nor used the scales before.  (Tr. at 79.)  During the evidentiary hearing, Lee admitted that he had previously been convicted of perjury and of possession of a forged instrument. (Tr. at 79-80.)

### C.    Application

Lee makes several arguments in his motion to suppress the evidence seized at his residence.  In essence, Lee argues that law enforcement officers did not have a search warrant and that he did not consent to the search.  (Lee Supp. Br. at 2-4.)

34

Specifically, Lee contends that Agent Eckert's testimony at the evidentiary hearing was not credible. (*Id.* at 5-6.) In addition, Lee argues that even if the court finds Agent Eckert more credible than Lee and Ms. Cephus, the court should still suppress the physical evidence seized as "fruits of such a search as the alleged 'consent' was obtained by law enforcement under duress." (*Id.*)

### 1. Agent Eckert Was Credible

First, as to the issue of witness credibility at the evidentiary hearing, the court, after closely observing the demeanor of the witnesses and upon review of the parties' written submissions, finds that Agent Eckert's account of the search was credible. Although Lee identifies inconsistencies in Agent Eckert's testimony (*id.* at 5-6), the court agrees with the government that these inconsistencies are, at best, minor, and do not cast doubt on Agent Eckert's testimony or candor (*see* ECF No. 95, Gov't Post-Hearing Response dated 4/30/14 ("Gov't Post-Hr'g Resp.") at 2-3). The court finds that Agent Eckert was a truthful and reliable witness particularly given his ready acknowledgment that the DEA sometimes does not give suspects *Miranda* warnings until they are transported to the DEA office and that such a scenario occurred with Lee, an admission that hardly helps the government's case.

In contrast, the court notes that Lee and Ms. Cephus did not appear credible during the hearing, and in fact, their sworn affidavits submitted with Lee's Amended Omnibus motion contracted their sworn hearing testimony. Specifically, in Lee's sworn affidavit, he avers that "[l]aw enforcement agents were in the garage and basement areas prior to searching my apartment and placing me under arrest." (Lee Omnibus Mot. at 6.) At the evidentiary hearing, however, Lee testified that he was in his apartment, sitting in his bedroom, when law enforcement agents entered his residence and arrested him. (Tr. at 72-73.) Lee did not testify about seeing any agents in the garage or basement prior to his arrest. Similarly, in Ms. Cephus's sworn affidavit, she states that she was "home at the time and was a witness to the search of the premises and arrest of my husband." (Lee Omnibus Mot. at 8.) During the hearing, however, Ms. Cephus contradicted her affidavit by testifying that she left the building *before* agents entered the apartment and arrested Lee, and that she was not present during the search. (Tr. at 60-62, 65-66.)

## 2. Lee Voluntarily Consented to the Search

As the court finds Agent Eckert and his testimony credible, the court also finds that the government has established by a preponderance of evidence that Lee voluntarily consented to the search of his residence. Even aside from Lee's

36

statement to Agent Eckert that he would cooperate and that agents could search his residence, Lee demonstrated his consent through the actions of moving around the bedroom to open the nightstand drawer, assisting and assenting to the opening of the safe in the bedroom closet (regardless of whether the safe was unlocked), and leading agents to the garage and the black plastic trash bags containing marijuana.

Lee contends that he gave consent under duress, in light of the agents' drawn weapons, his state of undress, and being placed under arrest and questioned about possessing any guns or drugs. (Lee Supp. Br. at 4.) This argument is unavailing. First, according to Agent Eckert's credible testimony, the agents who entered the bedroom reholstered their weapons as soon as they saw that Lee was unarmed. (Tr. at 7.) As to the fact that Lee was under arrest at the time he gave consent, the Second Circuit has repeatedly held that "neither the fact that a person is in custody nor that [he] has been subjected to a display of force rules out a finding of voluntariness." *United States v. Moreno*, 701 F.3d 64, 77 (2d Cir. 2012); *see also Ramirez*, 903 F. Supp. at 590-91 (finding valid consent where arrest was carried out quickly and with no violence, officers who had initially drawn guns during arrest had reholstered them, and there was no indication that the handcuffed defendant was restrained with physical force or

threatened by agents). The coercion inherent in the fact of arrest is itself insufficient to demonstrate that the consent was coerced. *Valencia*, 645 F.2d at 1165 (citing *United States v. Watson*, 423 U.S. 411, 424 (1976)). Additionally, Lee was arrested for only a brief period of time before giving his consent, there is nothing about his age or intelligence that suggests his consent was involuntary, and there is no allegation that agents threatened Lee. *See Puglisi*, 790 F.2d at 243-44 (listing age, intelligence, length of detention, and whether person was threatened as relevant factors in determining voluntariness).

Therefore, under the totality of these circumstances, the court finds that there was a reasonable basis for the agents to believe that Lee voluntarily consented to the search of his residence and garage.

Lee also argues that the physical evidence found in his apartment and garage should be suppressed under the fruit of the poisonous tree doctrine, based on Lee's unwarned post-arrest statements to agents. (*See generally* Lee Supp. Br.) The court notes that the government has already conceded that it will not seek to admit any of Lee's statements made at the time of his arrest (Gov't Post-Hr'g Resp. at n.1), and as such, the motion to suppress Lee's post-arrest statements has been granted. *See supra*, section VI. Despite the suppression of Lee's post-arrest

statements, however, Lee's fruit of the poisonous tree argument cannot succeed.  In *United States v. Patane*, 542 U.S. 630 (2004), the Supreme Court held that the physical fruits of a voluntary, unwarned statement do not implicate the Self-Incrimination Clause, and therefore, such physical evidence is admissible.  *Patane*, 542 U.S at 639-40; *see also United States v. McCoy*, 407 F. App'x 514, 516 (2d Cir. 2010) (citing *Patane* in holding that physical evidence discovered as a consequence of unwarned statements should not be suppressed).  Moreover, Lee consented to the search of the residence by showing agents where physical evidence was located.  Accordingly, under *Patane*, Lee's motion to suppress the physical evidence as fruits of unwarned statements is denied.

### 3.  Kitchen Items in Plain View

Finally, regarding the grinder, sifter, gas mask, scales, and bottle of cutting agent found in the kitchen, the court finds that these items were in plain view and were lawfully seized by law enforcement agents.

Under the "plain view" doctrine, if law enforcement agents "are lawfully in a position from which they view an object, if its incriminating nature is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant."  *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).  "[I]f contraband is left in open view

and has been observed by a police officer from a lawful vantage point, there has been no invasion of a legitimate expectation of privacy and thus no 'search' within the meaning of the Fourth Amendment." *Id.* For an object's incriminating nature to be immediately apparent, a reasonable agent must conclude that probable cause exists to believe the object constitutes evidence or fruit of a crime. *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010); *United States v. Delva*, No. 12 Cr. 802, 2014 WL 1378770, -- F. Supp. 2d --, at *6 (S.D.N.Y. 2014) ("It is not necessary that an officer know with certainty that an object seized is or contains evidence of a crime at the moment of seizure; it is enough that there be probable cause to associate the object with criminal activity.").

Items located in open containers have been held to be in plain view. *Echevarria*, 692 F. Supp. 2d at 332 (marijuana in clear plastic bags, packed inside a partially open box, was validly seized under the plain view doctrine); *United States v. Hammett*, 555 F. App'x 108, 109 (2d Cir. 2014) (scale inside open bag was in plain view); *United States v. Ocampo*, 650 F.2d 421, 427 (2d Cir. 1981) (currency sitting in opened bag was in plain view); *United States v. Terry*, 702 F.2d 299, 319 (2d Cir. 1983) (scale was lawfully seized where DEA agent "had to walk over to the box and look into it before determining that the box contained a scale" and "the open box revealed part of the scale

with white powder residue on it").

Here, the law enforcement agents were lawfully in the apartment to execute a valid arrest warrant, and were standing in the kitchen adjacent to the front door. As Agent Eckert testified, the items in the open bag were visible if one walked next to the bag and looked down. (Tr. at 17.) Under similar circumstances, the Second Circuit in *United States v. Barrios-Moriera*, 872 F.2d 12, 16 (2d Cir. 1989), *abrogated on other grounds by Horton v. California*, 496 U.S. 128 (1990), upheld a search and seizure under the plain view doctrine. Specifically, the Second Circuit held that evidence was lawfully seized under the plain view doctrine when a law enforcement agent "glanced down" to an open shopping bag and saw a rectangular object wrapped in tape, which turned out to be a package of cocaine. *Id*. In addition, it was immediately apparent to Agent Eckert and his team that the items in the open bag were associated with criminal narcotics trafficking activity. Agent Eckert testified that the sifter, scales, grinder, and bottle of cutting agent were tools used in the narcotics trade to weigh, cut, and dilute drugs, and were the types of items typically found in searches conducted on the residences of individuals who participate in drug trafficking activities. (Tr. at 11.)

Accordingly, because the law enforcement agents were lawfully in Lee's kitchen, had probable cause to believe that

the objects in the open bag constituted evidence of drug trafficking crimes, and the items were in plain view before being seized, the court finds that the seizure of evidence in the kitchen was justified under the plain view doctrine. Therefore, Lee's motion to suppress the evidence found in the kitchen is denied.

## VIII. Motion to Suppress Evidence Seized from Faltine's Restaurant

Faltine moves to suppress evidence seized from his restaurant, located at 5222 Church Avenue, contending that the evidence is the "product of illegally obtained statements and therefore the 'fruit of the poisoness [*sic*] tree.'"[10] (ECF No. 94, Faltine Reply filed 4/23/14 ("Faltine 4/23/14 Reply") at 2; ECF No. 98, Mem. in Further Support of Mot. to Suppress filed 5/6/14 ("Faltine 5/6/14 Mem.").)  In an earlier submission, Faltine challenged the validity of the search warrant authorizing the search of the restaurant.  (ECF No. 77, Faltine Reply filed 12/26/13 ("Faltine Reply") at 2.)  Faltine also asks that the court suppress the fact that he was present during the

_____

[10] The court notes that Mr. Siegel, Faltine's defense counsel, filed several submissions containing similar spelling and grammatical errors.  In addition, Faltine did not submit a factual affidavit based on personal knowledge placing any facts in dispute.  *See United States v. Aparo*, 221 F. Supp. 2d 359, 369 (E.D.N.Y. 2002) (denying suppression motion where defendant failed to submit affidavit alleging facts which would require suppression if those facts were proved at a hearing).  The court cautions Mr. Siegel to take more care in preparing any future submissions, particularly given the serious nature of the charges his client faces.

search and discovery of the contraband in his restaurant. (Faltine 4/23/14 Reply at 2.)

On April 24, 2013, Magistrate Judge Reyes signed an arrest warrant for Faltine for conspiracy to distribute narcotics, and a warrant to search Faltine's restaurant. (*See* 5222 Church Ave. Search Warrant.) On the morning of April 25, 2013, DEA agents executed both warrants at Faltine's restaurant. (ECF No. 97, Gov't Response to Faltine's Mot. to Suppress filed 5/1/14 ("Gov't Response to Faltine Mot.") at 1.) The agents entered the restaurant, located Faltine, advised him that he was under arrest, and took him into custody. (*Id.*) The agents asked Faltine to sit down in the front of the restaurant while they searched the restaurant. (*Id.*) Pursuant to the search warrant, the agents began searching the back of the restaurant. (*Id.*) Faltine was advised that he should cooperate, and was asked, without being given a *Miranda* warning, whether there were drugs in the restaurant. (*Id.*) Faltine replied that there were drugs and said he could show agents where the drugs were located.[11] (*Id.* at 1-2.) Faltine first directed the agents at the back of the restaurant to a plastic bag containing powder cocaine, which was sitting on a desk in the restaurant's office. (*Id.* at 2.) Faltine then showed agents a plastic bag containing

_____

[11] According to Faltine, "the arresting officers conducted a full search of the restaurant without the defendant's permission and consent," and did not give Faltine a *Miranda* warning after they arrested him. (Faltine Mot. at 2.)

crack cocaine, which was located inside the pocket of a coat

hanging near the desk. (*Id.*) Faltine next opened a filing

cabinet, took out a beige pocketbook, and from the pocketbook

took out a plastic bag containing marijuana. (*Id.*) Agents then

took Faltine to the front area of the restaurant, and continued

searching for additional evidence. Agents found a $20 bill with

"Good luck from Saleem" written on it, bundles of United States

currency, and scales with narcotics residue. (*Id.*)

### A.    Legal Standard

The Fourth Amendment, which prohibits "unreasonable

searches and seizures," requires that "no warrants shall issue,

but upon probable cause, supported by Oath." U.S. Const. amend.

IV.  In *Illinois v. Gates*, 462 U.S. 213 (1983), the Supreme

Court set forth a totality-of-the-circumstances test for

determining whether probable cause exists to support a search

warrant.  The issuing judicial officer must "make a practical,

common-sense decision whether, given all the circumstances set

forth in the affidavit before him, . . . there is a fair

probability that contraband or evidence of a crime will be found

in a particular place." *Gates*, 462 U.S. at 238.  A reviewing

court "must accord substantial deference to the finding of an

issuing judicial officer that probable cause exists," and its

determination "should be limited to whether the issuing judicial

officer had a substantial basis for the finding of probable

cause." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993)
(internal citations omitted). The "resolution of doubtful or
marginal cases . . . should be largely determined by the
preference to be accorded to warrants." *United States v.
Ventresca*, 380 U.S. 102, 109 (1965).

**B.    Application**

**1.    Search Warrant's Validity**

Faltine's motion to suppress evidence advances two
arguments. First, Faltine argues that the search warrant
authorizing the search of his restaurant was invalid. (Faltine
Reply at 2.) Specifically, Faltine contends that the
information on which Agent Eckert relied for his supporting
affidavit was stale and outdated; that the intercepted telephone
calls submitted to support the application did not describe
narcotics activity; and that, on the whole, the application
failed to establish probable cause to search his restaurant.
(*Id.*)

Upon review of the relevant case law and Agent
Eckert's supporting affidavit, the court finds Faltine's
challenge to the search warrant's validity to be meritless.

First, as to the issue of staleness, "in determining
whether probable cause exists [to authorize a warrant], the
magistrate is required to assess whether the information adduced
in the application appears to be current, *i.e.*, true at the time

45

of the application, or whether it has become stale." *Rivera v.*
*United States*, 928 F.2d 592, 602 (2d Cir. 1991). "Narcotics
conspiracies are the very paradigm of the continuing enterprises
for which the courts have relaxed the temporal requirements of
non-staleness. Indeed, if a criminal enterprise is
appropriately extended, information can remain fresh for
probable cause for years." *United States v. Feola*, 651 F. Supp.
1068, 1090 (S.D.N.Y. 1987) (internal citations omitted).
"Facts of past criminal activity that by themselves are too
stale can be sufficient [to establish probable cause] if the
affidavit also establishes a pattern of continuing criminal
activity so there is reason to believe that the cited activity
was probably not a one-time occurrence." *Wagner*, 989 F.2d at 75
(citing *United States v. Fama*, 758 F.2d 834, 838 (2d Cir.
1985)). Courts in this circuit have found probable cause based
on information that is more than several months old. *E.g.*,
*United States v. Rowell*, 903 F.2d 899, 903 (2d Cir. 1990)
("Given the continuous nature of narcotics conspiracies . . .
the approximately 18-month delay between procuring the
informants' statements and seeking the wiretap warrant did not
render the information stale."); *Feola*, 651 F. Supp. at 1091
(finding probable cause for wiretap affidavit where informants'
information about narcotics conspiracy was almost four years
old); *Rivera*, 928 F.2d at 602 (noting that Second Circuit

precedents have upheld relying on information "22 days to 18 months old").

Here, Agent Eckert's April 24, 2013 affidavit supporting the search warrant for Faltine's restaurant describes activity that occurred from 2009 to April 2013, with most of the information relating to events in 2012. (Gov't Opp., Ex. C, Faltine Search Warrant dated 4/24/13 ("Faltine Search Warrant"), at 5-11.) The search warrant was issued on April 24, 2013. The affidavit alleges a narcotics trafficking conspiracy that continued for several years. One confidential informant, "CS 1," indicated that Faltine received and distributed cocaine every two weeks from 2009 to August 2012, and that from 2011 to the summer of 2012, Faltine distributed drugs out of his restaurant. (Faltine Search Warrant at 8.) Another confidential informant, "CS 2," purchased cocaine from Faltine at the restaurant premises in December 2012, under the supervision of police detectives. (*Id.* at 9.) A third confidential informant, "CS 3," indicated that he communicated with Faltine regarding the distribution of narcotics in April 2013, the same month the search warrant was issued. (*Id.*) In addition, agents intercepted cellular phone communications that occurred during the summer of 2012 between Faltine and Fletcher Voisin, the alleged leader of a drug trafficking organization based in Brooklyn and who was arrested on August 1, 2012. (*Id.*

at 5, 10-12.)  Based on his experience and training, Agent
Eckert affirmed that he believed the phone communications
involved discussions for payment for narcotics.  (*Id.* at 10.)

Viewing the information in the affidavit as a whole,
the affidavit alleges a conspiracy that had continued for
approximately four years.  Furthermore, the affidavit includes
information describing narcotics activity that occurred the same
month that the search warrant was issued.  It was thus
permissible for Magistrate Judge Reyes to conclude that probable
cause existed regarding Faltine's involvement in a continuing
narcotics conspiracy, and that the information contained in the
affidavit was not stale.  *See Feola*, 651 F. Supp. at 1091
("Viewing the evidence as a whole . . . the Court can reasonably
discern the outlines of a single continuing course of criminal
activity . . . .  Information about any aspect of these ongoing
activities is unlikely to be stale no matter how old.")

Faltine further argues that the warrant is not
supported by probable cause because the government failed to
provide more detail about the reliability of its informants, and
the "cryptic" intercepted telephone calls between Faltine and
Voisin "do not demonstrate narcotics activity."  (Faltine Reply
at 2.)  The court finds that both arguments lack merit, and that
Agent Eckert's affidavit contained ample support for Magistrate

Judge Reyes's conclusion that there was probable cause to search Faltine's restaurant.

In assessing probable cause based on information supplied by an informant, "the core question . . . is whether the information is reliable." *Wagner*, 989 F.2d at 72. Information may be sufficiently reliable to support a magistrate judge's finding of probable cause if the informant has a track record of providing reliable information or if the information is corroborated by independent evidence. *Id*. at 73. Moreover, information that is based on the informant's first-hand observations bolsters a finding of reliability. *Id.; United States v. Soto*, 52 F. App'x 534, 535 (2d Cir. 2002). Even if an informant has no proven track record of providing reliable information, if the informant's information "is corroborated in material respects, the entire account may be credited, including parts without corroboration." *Wagner*, 989 F.2d at 73.

Here, the government's supporting affidavit relied on three confidential informants, all of whom had personally interacted with Faltine in the context of narcotics activity. The first informant, CS 1, indicated that Faltine owns a restaurant at 5222 Church Avenue in Brooklyn, New York, and that he saw Faltine distribute narcotics from the restaurant premises in the summer of 2012. (Faltine Search Warrant at 8.) CS 1 also noted that Faltine had previously been robbed for money and

narcotics at the restaurant, information that was corroborated by a police investigation into a robbery at the restaurant in March 2012 (and for which Faltine was identified as the complainant), as well as by the government's third confidential informant, CS 3. (*See id*. at 8-9.) CS 1 further identified the phone number of one of Faltine's cellular phones ("Telephone 3") as Faltine's phone number. (*Id.* at 10.) The government's second informant, C2, made a supervised purchase of cocaine from Faltine at the restaurant in December 2012. (Faltine Search Warrant at 9.) "An informant's participation in supervised drug purchases is powerful corroborative evidence for purposes of determining probable cause." *Wagner*, 989 F.2d at 73; *McColley v. Cnty. of Rensselaer*, 740 F.3d 817, 843 (2d Cir. 2014). Additionally, C2 informed law enforcement that he had purchased cocaine from Faltine in the past, and identified one of Faltine's phone numbers ("Telephone 4") as Faltine's number. (Faltine Search Warrant at 9, 10.) Both CS 1 and CS 3 noted that Faltine's nickname was "Blacky," which was corroborated by the intercepted phone calls in which Faltine identifies himself as "Blacky" or Voisin calls him by that name. (*Id.* at 8-9, 11.) Finally, the third confidential informant, CS 3, had communicated with Faltine about the distribution of narcotics in April 2013, and also noted, like CS 1, that Faltine had been previously robbed for narcotics. (*Id.* at 9.) Thus, not only

did all three informants have first-hand knowledge of Faltine's activities, but their information was corroborated by a police-supervised drug purchase, the police investigation into a reported robbery at Faltine's restaurant, and the intercepted telephone calls. Under such circumstances, the court finds that Magistrate Judge Reyes had a substantial basis to conclude that the informants and the information they provided were sufficiently reliable for a determination of probable cause.

Furthermore, the court finds unpersuasive Faltine's contention that the intercepted telephone calls between him and Voisin "do[] not describe narcotics activity." (Faltine Reply at 2.) Faltine focuses on the telephone call from July 26, 2012, during which agents intercepted the following conversation.

> Faltine: Stop by and pick up this thing. I have a
> [unintelligible] for you, 20.
>
> Voisin: Alright, cool. Later on.
>
> Faltine: How soon?
>
> Voisin: In about 15 minutes
>
> Faltine: Alright.

Faltine argues that "[t]here is no criminal activity described in the call rather just a reference of picking up something." (Faltine Reply at 2.) The court respectfully disagrees that a single conversation precludes a finding of probable cause. The

court finds that, after examining the intercepted communications as a whole as well as within the context of the information provided by the three confidential informants, Magistrate Judge Reyes had a substantial basis to conclude that probable cause existed to authorize the search warrant of Faltine's restaurant for evidence of narcotics trafficking activity.

Accordingly, Faltine's challenge to the validity of the search warrant is respectfully denied.

### 2. Fruit of the Poisonous Tree

Alternatively, Faltine seeks to suppress the evidence found at his restaurant under a fruit-of-the-poisonous tree theory, arguing that because his unwarned post-arrest statements led agents to the discovery of evidence, the evidence should therefore be suppressed. (*See generally* Faltine 4/23/14 Reply.) In the event that the evidence is not suppressed, Faltine requests that "[d]uring the introduction of the contraband [at trial,] no mention should be made of Mr. Faltine being present when [*sic*] the search and discovery of the contraband." (*Id*. at 2.)

As previously discussed, the exclusionary rule does not apply to the physical fruit of a voluntary, unwarned statement. *Patane*, 542 U.S. at 642-43; *see also McCoy*, 407 F. App'x at 516 (applying *Patane* and holding that court should not have suppressed evidence despite officers' failure to give

*Miranda* warnings); *United States v. Haygood*, 157 F. App'x 448,
449 (2d Cir. 2005) (citing *Patane* with approval). Moreover, the
search of Faltine's restaurant was conducted pursuant to a valid
search warrant, which authorized a search of the restaurant and
any closed containers and items contained therein for "firearms,
narcotics, scales, cutting agents, other drug paraphernalia,"
and various other items that could constitute evidence of a
conspiracy to distribute narcotics. (Faltine Search Warrant at
16.) "In the absence of an allegation that the magistrate [who
authorized the search warrant] abandoned his detached and
neutral role, suppression [of evidence seized pursuant to a
search warrant] is appropriate only if the officers were
dishonest or reckless in preparing their affidavit or could not
have harbored an objectively reasonable belief in the existence
of probable cause." *United States v. Leon*, 468 U.S. 897, 926
(1984). Here, Faltine makes no such allegation, and
accordingly, he has no legal basis for suppressing the evidence
seized from the restaurant.

Finally, even if Faltine had been properly given a
*Miranda* warning and had not said anything to agents the day of
the search, it was inevitable that agents would have discovered
the evidence while executing the valid search warrant. Thus,
under the doctrine of inevitable discovery, which is an
exception to the exclusionary rule, Faltine's suppression motion

fails.  *See United States v. Eng*, 971 F.2d 854, 859 (2d Cir.
1992) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)).

For the foregoing reasons, the court respectfully
denies Faltine's motion to suppress the evidence seized from his
restaurant and to invalidate the search warrant.  In addition,
Faltine's request that no mention be made at the introduction of
evidence at trial of his presence during the search is wholly
without any basis in the law, and it is also denied.

## IX.  Motion to Suppress Evidence from Electronic Surveillance of Cellular Phones

Lee, joined by Jaikaran and Faltine, moves to suppress
evidence derived from the wire interception of Fletcher Voisin's
and Lee's cellular phones.  (Lee Omnibus Mot. at 17-28; Jaikaran
Mot. at 1; Faltine Mot. at 3.)  On July 5, 2012, based on an
affidavit submitted by Agent Eckert, Judge Brodie authorized the
wire interception of the telephone number (310) 357-5229, which
had no subscriber information and was being used by Voisin.[12]
(Gov't Opp., Ex. A, Voisin Wiretap Affidavit dated 7/5/12
("Voisin Wiretap").)  On August 31, 2012, based on Agent Boc's
affidavit, Judge Reyes authorized a search warrant for

---

[12] Lee appears to mistake the wiretap of Voisin's phone for a wiretap of his
own phone. (*See* Lee Omnibus Mot. at 18 (moving to "suppress all evidence
derived from the eavesdropping and/or electronic surveillance conducted of
COREY LEE's cellular phone (310) 357-5229, which law enforcement agents
listed Mr. Lee as the owner and user of").)  Based on the arguments in Lee's
brief, the court interprets Lee's motion as a challenge to the Voisin Wiretap
as well as to the location data search of the phone with the (718) area code
registered to Ms. Cephus.

information about the location of the cellular telephone

assigned call number (718) 598-2474, which was registered under

Ms. Cephus's name and believed to be used by Lee. (Gov't Opp.,

Ex. B, Lee Cell Phone Warrant dated 8/31/12 ("Lee Cell Phone

Warrant").)

Defendants argue that all evidence derived from

electronic surveillance should be suppressed because: (1) there

was insufficient probable cause to authorize the Voisin Wiretap

(Lee Omnibus Mot. at 18-19, 24-27); (2) the Voisin Wiretap

affidavit failed to allege that probable cause existed as to

each of the co-defendants (*id.* at 19-20); (3) there "were

material misrepresentations in the Government's initial

application for an eavesdropping warrant" that undermine any

probable cause determination, and that accordingly, a *Franks*

hearing is warranted (*id.* at 28); and (4) the government failed

to properly minimize the interception (*id.* at 24).

After reviewing the parties' arguments, the relevant

legal authority, and the electronic surveillance affidavits, the

court finds that defendants' motion for suppression of evidence

derived from the Voisin Wiretap and the location data search of

Lee's phone is meritless, and respectfully denies it.

A.    **Probable Cause for Voisin Wiretap**

Defendants first contend that there was insufficient

probable cause for the authorization of the wire interception of

Voisin's phone because Agent Eckert's affidavit, and its reliance on confidential informants, did not meet the two-prong test for informant reliability as set forth in *Aguilar v. Texas*, 378 U.S. 108 (1964), and *Spinelli v. United States*, 393 U.S. 410 (1969).  (Lee Omnibus Mot. at 24-27.)

      **1.    Legal Standard**

      Title 18 U.S.C. § 2518(10)(a) allows an "aggrieved party" to move to suppress wiretap evidence on various grounds. An aggrieved person is defined as a "person who was a party to any intercepted wire, oral, or electronic communication or a person against whom the interception was directed."  18 U.S.C. § 2510(11).  A defendant whose voice was heard on the wire, or whose telephone was tapped, has standing to challenge evidence obtained through the use of electronic surveillance.  *United States v. Burford*, 755 F. Supp. 607, 609 (S.D.N.Y. 1991) (citing *United States v. Fury*, 554 F.2d 522, 525 (2d Cir. 1977)).  Here, the government acknowledges that Lee, Faltine, and Glynn were all captured on the Voisin Wiretap, and that Jaikaran was named as an interceptee.  Thus, defendants have standing to challenge the Voisin Wiretap.  (Gov't Opp. at 21.)

      A wiretap may only be authorized if a judge finds that the government's application establishes that:

         (a) there is probable cause for belief that an
         individual is committing, has committed, or is about

to commit a particular offense enumerated in [18 U.S.C
§ 2516];

(b) there is probable cause for belief that particular
communications concerning that offense will be
obtained through such interception; [and] . . .

(d) . . . there is probable cause for belief that the
facilities from which, or the place where, the wire,
oral, or electronic communications are to be
intercepted are being used, or are about to be used,
in connection with the commission of such offense, or
are leased to, listed in the name of, or commonly used
by such person.

18 U.S.C § 2518(3). The standard of probable cause under the
wiretap statute "is the same as the standard for a regular
search warrant." *Fury*, 554 F.2d at 530. When an application
for a wiretap relies on information provided by an informant,
the judge authorizing the wiretap makes "a practical, common-
sense decision whether, given all the circumstances set forth in
the affidavit before him, including the veracity and basis of
knowledge of persons supplying hearsay information," there is
probable cause. *Gates*, 462 U.S. at 238. The reviewing court
accords "substantial deference" to the issuing judge's finding
of probable cause, and limits itself to determining whether the
issuing judge had a "substantial basis" for the finding of
probable cause. *Wagner*, 989 F.2d at 72.

## 2. Application

The court notes, at the outset, that Lee erroneously
asserts that a state court judge authorized the Voisin Wiretap

(Lee Omnibus Mot. at 25), when in actuality, Judge Brodie of the United States District Court for the Eastern District of New York authorized the wiretap. Additionally, despite Lee's reliance on *Aguilar v. Texas* and *Spinelli v. United States* for the legal standard in determining probable cause, the proper standard to apply in determining whether an informant's information establishes probable cause for the issuance of a wiretap order is set forth in *Illinois v. Gates*, 462 U.S. 213 (1983), which overruled the two-pronged test of *Aguilar* and *Spinelli*. *Gates*, 462 U.S. at 230-33.

Here, the court finds that Judge Brodie had a substantial basis for finding that probable cause existed for the Voisin Wiretap. First, Agent Eckert's supporting affidavit readily establishes probable cause that at least one individual, Voisin, was engaged in narcotics trafficking, thus meeting the first requirement under Section 2518. The affidavit describes intercepted telephone conversations between Voisin and Carlos Save-Rendon[13] in which Voisin and Save-Rendon discuss quantities and prices of drugs, the transportation of narcotics from Arizon to New York, and other individuals involved in their drug trafficking organization. (*See* Voisin Wiretap at 11-19.) The criminal nature of Voisin's and Save-Rendon's telephone

---

[13] Save-Rendon is not a defendant in this case. Agent Eckert's affidavit describes telephone conversations that were intercepted pursuant to a wiretap of Save-Rendon's phone. (Voisin Wiretap at 9-20.)

conversations was corroborated when law enforcement officers arrested, in Pennsylvania, an individual identified by an informant to be a member of their drug organization, and seized twelve kilograms of cocaine from the individual's vehicle. While the individual was in custody, his cell phone received numerous calls from the phone number associated with Voisin. Moreover, agents intercepted a telephone conversation between Voisin and Save-Rendon in which the two discussed the individual's whereabouts, with Voisin noting that the individual "never showed up at the location." (*Id.* at 17-19.) In addition, three confidential informants provided information about Voisin's receipt of cocaine from Arizona-based suppliers. (*See id.* at 11, 20-24.) Notably, information provided by Confidential Informant #3, who admitted to traveling between Arizona and New York approximately six times to deliver cocaine to Voisin, was corroborated by location data obtained from Voisin's telephone. (*See id.* at 23-24.)

Thus, based on Agent Eckert's affidavit, Judge Brodie had a substantial basis for concluding that the probable cause requirements of Section 2518 were met: that there was probable cause an individual, Voisin, was engaging in narcotics trafficking; that there was probable cause that communications concerning narcotics trafficking would be obtained through the wire interception of Voisin's telephone; and that there was

probable cause the target telephone, commonly used by Voisin, was being used in connection with the commission of narcotics trafficking. *See* 18 U.S.C. § 2518(3).

Moreover, the court finds that defendants' challenges to the reliability of the confidential informants are meritless. Under the totality-of-the-circumstances test set forth in *Gates*, the informants were reliable and their information supported Judge Brodie's determination of probable cause for the Voisin Wiretap. The affidavit specified how long each informant had been providing information to the DEA, the basis of their information, and how their information was corroborated. Confidential Informant #1, who had been cooperating with the DEA and providing information since November 2011, provided information regarding Save-Rendon's involvement in the transportation of large quantities of cocaine to New York and other details about other individuals involved in the drug trafficking organization. (Voisin Wiretap at 11-12.) Confidential Informant #1's information was corroborated by physical surveillance; the arrest of an individual, identified by Confidential Informant #1, transporting cocaine from Arizona to New York; and wire intercepts of Save-Rendon's cellular phone in which Save-Rendon and Voisin discussed details of their drug trafficking activities. (*See id.* at 12-20.)

Confidential Informant #2 was involved first-hand in Voisin's drug trafficking organization, and had been providing information to the DEA for several months. (*Id.* at 20.) Confidential Informant #2 indicated that he had delivered cocaine to "Saleem" (Voisin's middle name is Saleem) on twelve occasions. (*Id.* at 21.) Confidential Informant #2 also stated that "Saleem" introduced "Justin" as his brother, and that Justin was involved in receiving cocaine. (*Id.*) The association between Voisin and Justin Jaikaran was corroborated by video surveillance. Police surveilled and installed a pole camera to monitor a warehouse at 305 East 89th Street after location data taken from Voisin's cellular telephone revealed that he had repeatedly traveled to that warehouse. (*Id.* at 32.) Voisin and Justin Jaikaran were seen together at the warehouse in June 2012. (*Id.* at 21.) Confidential Informant #2 also stated that "Saleem" ran a small grocery store. (*Id.* at 22.) The government's investigation revealed that Voisin previously ran a newstand in Brooklyn named B8 Newstand, and that he still maintained bank accounts in the name of B8 Newstand. (*Id.*)

Thus, the information provided by Confidential Informant #2 was gained through that individual's personal, first-hand experience; corroborated by physical surveillance; or, as will be discussed, corroborated by Confidential Informant #3. "Even where an informant has no proven record, if an

informant's [information] is corroborated in material respects, the entire account may be credited." *Wagner*, 989 F.2d at 69. There was, accordingly, ample evidence for Judge Brodie to conclude that Confidential Informant #2 was reliable and that the information set forth in the affidavit was truthful.

Similarly, the information provided in the affidavit by Confidential Informant #3 was reliable under *Gates*. Confidential Informant #3 had traveled to New York from Arizona six times to deliver cocaine to two individuals in Brooklyn, "Bin Laden" and an individual whom "Bin Laden" introduced as his brother. (*Id.* at 23.) Confidential Informant #3 also stated that "Bin Laden" had a bodega called B Street Newstand. (*Id.*) As previously discussed, this information was corroborated by Confidential Informant #2 and independent investigation. Furthermore, Confidential Informant #3 stated that "Bin Laden" had a warehouse in Brooklyn to receive cocaine (*id.*), which, as discussed before, was corroborated by physical surveillance and location data. (*Id.*) Finally, both Confidential Informant #3 and Confidential Informant #2 indicated that they delivered cocaine on behalf of Joel Sesma, an individual who lived in Arizona, and that another member of the organization was Gerald Herrera. (*Id.* at 22, 24.) Therefore, given how Confidential Informant #3's information was corroborated, and applying the "common sense, totality-of-the-circumstances test" under *Gates*,

the court finds that it was reasonable for Judge Brodie to conclude that the information provided by Confidential Informant #3 was reliable and truthful.

Accordingly, defendants' attempt to challenge the Voisin Wiretap on the basis of lack of probable cause and unreliable informants is denied. There was ample basis for Judge Brodie's determination that probable cause existed, based on the information supplied in the affidavit, for the Voisin Wiretap.

### B. Probable Cause for Location Data Search of Lee's Phone

Although Lee does not appear to specifically address the validity of the location data search of the cellular phone registered to Ms. Cephus and allegedly used by Lee, the court, in an abundance of caution, will discuss the issue briefly.

An examination of Agent Boc's supporting affidavit for the location data search shows that there was a substantial basis for Judge Reyes to determine there was probable cause for the order. From the Voisin Wiretap, agents intercepted various conversations between Voisin and Lee (who used the subject telephone number) in which the two discussed narcotics transactions, including payment details. (*See* Lee Cell Phone Warrant at 4-7.) In addition, agents conducting surveillance of the warehouse located at 305 East 89th Street observed Lee arrive at the warehouse in a black Porsche registered in his

name, speak to another individual, and then spend approximately twenty minutes inside the warehouse.  (*Id.* at 7.)

Agent Boc's affidavit also relied on confidential informants.  Confidential Informant #1 indicated that Lee received cocaine every two weeks from a warehouse located at 305 East 89th Street, and that Lee would pick up the cocaine in a maroon Mercedes or a black Porsche.  (*Id.* at 8.)  This information was corroborated by agents' physical surveillance. Confidential Informant #1 also provided the subject telephone number as Lee's number, which was corroborated by the interception of Lee's and Voisin's conversations.  (*Id.*) Confidential Informant #2, corroborating Confidential Informant #1, also provided the same telephone number as Lee's number, and indicated that Lee picked up narcotics from a warehouse located at 305 East 89th Street using a maroon Mercedes or a black Porsche.  (*Id.* at 9.)

Based on the totality of these circumstances, there was a substantial basis for Judge Reyes to find that the information provided by the confidential informants was reliable, and that probable cause existed for the issuance of a search warrant for location data for Lee's phone.

### C.  Probable Cause as to Each Defendant Not Required

Defendants further argue that because the affidavit for the Voisin Wiretap did not allege that probable cause

existed as to each of them, the wiretap was not valid. (*See* Lee Ominbus Mot. at 19-20. ("There is no characterization regarding Mr. Lee, nor any information as to his suspected activities and connections with individuals already identified and under investigation."))  This challenge to the Voisin Wiretap is also unavailing.

### 1.  Legal Standard

Title 18 U.S.C. § 2518(3) only requires probable cause as to "*an* individual."  18 U.S.C. § 2518(3)(a) (emphasis added).  The wiretap statute "does not require that every person whose conversations are intercepted must be named in the application before evidence obtained by the wiretap can be used against him."  *United States v. Ambrosio*, 898 F. Supp. 177, 184 (S.D.N.Y. 1995) (Chin, J.); *United States v. McGuinness*, 764 F. Supp. 888, 900 (S.D.N.Y. 1991).  "Rather, the statute's conditions are satisfied so long as the affidavit names 'an individual' for whom there is probable cause to suspect criminal activity."  *Ambrosio*, 898 F. Supp. at 184.  Thus, where the government has probable cause to monitor the target telephone, it may also monitor other person's calls over the target telephone "as long as the communications were likely to contain evidence of the criminal activity that was being investigated," even without probable cause as to other individuals whose conversations may be intercepted.  *Id*.

## 2. Application

Here, as discussed *supra*, probable cause existed as to Voisin's involvement in drug trafficking activities, and the conversations to be monitored were likely to contain evidence of such a crime. The government was therefore not required to establish probable cause as to each defendant in this case, and any lack of probable cause in the wiretap application as to the defendants in this case is irrelevant to the wiretap's validity.

## D. Request for *Franks* Hearing

Defendants also assert, without specifying in greater detail, that "there were material misrepresentations in the Government's initial application for an eavesdropping warrant" that undermine any probable cause determination. (Lee Omnibus Mot. at 28.) Defendants also request a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). In *Franks*, the Supreme Court held that the Fourth Amendment requires a hearing where a defendant makes a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit," and if the "allegedly false statement is necessary to the finding of probable cause." 438 U.S. at 155-56. It is the defendant's burden to make such a preliminary showing to merit a *Franks* hearing. *Id.*

Here, because defendants fail to make any specific allegations of material misrepresentations in the government's application for the Voisin Wiretap, a *Franks* hearing is clearly not required.  Defendants merely argue that the government's initial application to intercept Voisin's telephone and the government's later application for location monitoring of Lee's telephone "show a gross juxtaposition of the Government's allegations and hypotheses of Mr. Lee and his alleged activities associated with any drug conspiracies."  (Lee Omnibus Mot. at 28.)  It is not unusual, however, for an ongoing police investigation to unearth additional information, and consequently, the additional details contained in the government's application for location data do not therefore imply that a false statement was made to support the Voisin Wiretap application.  Without a more detailed showing of an allegedly false statement, and how that statement was necessary to the finding of probable cause, defendants' request for a *Franks* hearing is unavailing and is denied.

Furthermore, to the extent that defendants may hope to attack the Voisin Wiretap by alleging that a confidential informant made a false statement, they will be unsuccessful.  "As a general rule," if an informant made a false statement to an affiant, "that does not present grounds to challenge the search warrant so long as the affiant in good faith accurately

represents what the informant told him." *United States v. Wapnick*, 60 F.3d 948, 956 (2d Cir. 1995); *see also United States v. One Parcel of Property Located at 15 Black Ledge Dr.*, 897 F.2d 97, 101 (2d Cir. 1990). Here, there has been no allegation that Agent Eckert or Agent Boc did not in good faith accurately represent what the confidential informants told them.

The court therefore denies the request for a *Franks* hearing.

### E.    No Standing to Challenge Minimization Procedures

Finally, defendants assert that the government failed to properly minimize its interception of Voisin's telephone. (Lee Omnibus Mot. at 24.) Defendants, however, lack standing to raise the issue of improper minimization procedures employed for the Voisin Wiretap because any failure by the government to minimize the conversations obtained from the Voisin Wiretap would constitute an invasion of Voisin's privacy, not defendants' privacy. "It is well settled law in this Circuit that to have standing to challenge improper minimization during a wiretap . . . a defendant must show a direct privacy interest." *Burford*, 755 F. Supp. at 613; *Fury*, 554 F.2d at 526 (holding that defendant had no standing to challenge minimization procedures of wiretap of another target's telephone); *Alderman v. United States*, 394 U.S. 165, 174 (1969) ("Fourth Amendment rights are personal rights which . . . may

not be vicariously asserted."). "The primary way to show a direct injury to a privacy interest is to establish a possessory or proprietary interest" in the subject telephone. *Burford*, 755 F. Supp. at 613. Additionally, a defendant must show that he was "part of the conversations that allegedly exceeded the restrictions contained in the authorizing order." *United States v. Gallo*, 863 F.2d 185, 192 (2d Cir. 1988).

Here, defendants have not claimed any possessory or proprietary interest in Voisin's telephone, nor have they alleged that they were part of conversations that allegedly exceeded the scope of the Voisin Wiretap. Lee only alleges, in a general fashion, that the government intercepted "a substantial number of mundane, personal conversations wholly irrelevant to the investigation," without specifying who took part in those conversations or describing the content of the allegedly irrelevant conversations. (*See* Lee Omnibus Mot. at 24.) Jaikaran was named as an interceptee in the wiretap application, but has failed to allege that he was part of any conversation that allegedly exceeded minimization requirements. Indeed, Jaikaran concedes that "*he is not a recorded voice* [but] he is allegedly referred to on the recordings." (Jaikaran Mot. at 2 (emphasis added).) Faltine, who joined in the motion, does not provide any details to support his challenge to the minimization procedures. (*See* Faltine Mot. at 1, 3.)

Consequently, the court denies defendants' motion to suppress electronic surveillance evidence obtained from the Voisin Wiretap based on a lack of minimization.

## CONCLUSION

For the foregoing reasons, the court (1) grants to each movant leave to join in each other's motions; (2) denies defendants' motion for severance; (3) denies the motion to disclose grand jury empanelment instructions and to dismiss the indictment; (4) denies the motion for a bill of particulars; (5) denies the motion for disclosure of the government's confidential informants; (6) grants the motions by Lee and Faltine, with the reservations provided, to suppress their post-arrest statements made without *Miranda* warnings; (7) denies the motion to suppress evidence seized from Lee's residence; (8) denies the motion to suppress evidence seized from Faltine's restaurant; and (9) denies the motion to suppress electronic surveillance evidence obtained from the Voisin Wiretap and the location data search of Lee's phone.

**SO ORDERED.**

Dated:     September 2, 2014
           Brooklyn, New York

                              _____/s/_____
                              **KIYO A. MATSUMOTO**
                              United States District Judge
                              Eastern District of New York